**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RAS DATA SERVICES, INC., | ) | Case No. 25-11837 |
| | ) | |
| Debtor. | ) | Honorable Michael B. Slade |
| | ) | |

**JOINT RESPONSE TO OBJECTION TO CONFIRMATION OF THE SECOND
AMENDED JOINT PLAN OF LIQUIDATION OF DEBTOR AND
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS[1]**

Dated: July 6, 2026

| | |
|---|---|
| **ADELMAN & GETTLEMAN, LTD.** | **TUCKER ELLIS LLP** |
| | |
| Adam P. Silverman | Thomas R. Fawkes |
| Alexander F. Brougham | Brian J. Jackiw |
| Nicholas R. Dwayne | Jason J. Ben |
| 53 W. Jackson Blvd., Suite 1050 | 233 S. Wacker Dr., Suite 6950 |
| Chicago, Illinois 60604 | Chicago, Illinois 60606 |
| Tel: (312) 435-1050 | Tel: (312) 624-6300 |
| asilverman@ag-ltd.com | thomas.fawkes@tuckerellis.com |
| abrougham@ag-ltd.com | brian.jackiw@tuckerellis.com |
| ndwayne@ag-ltd.com | jason.ben@tuckerellis.com |
| | |
| | |
| *Counsel for Debtor and Debtor in Possession,* | *Counsel to the Official Committee of* |
| *RAS Data Services, Inc.* | *Unsecured Creditors* |

---

[1] Following discussions with the Plan Proponents, Progress Rail Services Corporation ("Progress Rail") has indicated that it intends to withdraw its objection to the Plan, and change its vote from rejection to acceptance of the Plan. The Plan Proponents are informed Progress Rail will be filing the appropriate documents after the filing of this Response. Consequently, the Response addresses only the objection to confirmation filed by CIT.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...............................................................................................1

RELEVANT BACKGROUND ...............................................................................................4

   A.  The Chapter 11 Case.............................................................................................4

   B.  The Infinity Adversary Proceeding and Settlement..............................................4

   C.  The Plan ...............................................................................................................5

ARGUMENT ........................................................................................................................10

   A.  The Plan may extinguish Owner Trust Claims, whether they are asserted
      offensively or defensively.....................................................................................10

      1.  The Plan is determining what constitutes property of the Estate, not adjudicating
         an adversary proceeding. .................................................................................10

      2.  CIT occupies a materially different position from those of other Owners. .................12

      3.  The Court may "blue-pencil" the Plan if the waiver of Owner Trust Claim
         defenses is deemed to be inappropriate. ...................................................................15

   B.  The Infinity Settlement satisfies the requisite standards for approval. ...............15

      1.  Terms of the Infinity Settlement ......................................................................16

      2.  Litigation's Probable Costs and Benefits...........................................................17

      a.  Litigation's Probability of Success on the Merits.........................................18

      b.  Range of Litigation Outcomes ....................................................................20

      c.  Litigation's Complexity..............................................................................22

      d.  Litigation's Attendant Expense, Inconvenience, and Delay .........................25

   C.  Infinity's classification is appropriate.................................................................26

      1.  The Infinity claim is unique, making its separate classification proper. ...................27

      2.  Separate classification is warranted to effect the Infinity Settlement.........................28

      3.  There would be an impaired, accepting class even without Infinity's separate
         classification. .................................................................................................29

   D.  The Plan Does Not Unfairly Discriminate...........................................................30

CONCLUSION......................................................................................................................32

## TABLE OF AUTHORITIES

**Cases**

*Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110, 118 (2d Cir. 2014).................. 16

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) ........ 36, 38

*Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994) ................................ 37

*Energy Co-op., Inc.*, 886 F.2d at 927 ..................................................................................... 37

*In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *aff'd*, 126 F.3d 955
  (7th Cir. 1997)................................................................................................ 36, 37

*Baeshen v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c))*, 520 B.R. 15, 23 (Bankr.
  S.D.N.Y. 2014) ......................................................................................................... 17

*In re Beard*, 112 B.R. 951, 955-56 (Bankr. N.D. Ind. 1990)............................................... 18

*In re Castleton Plaza, LP*, 707 F.3d 821 (7th Cir. 2013)................................................... 33

*In re Comm. W. Fin. Corp.*, 761 F.2d 1329, 1336-37 (9th Cir. 1985)......................................... 18

*In re Dernick*, 624 B.R. 799, 816, 822 (Bankr. S.D. Tex. 2020)................................................. 17

*In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007) ......................... 22, 23

*In re Draiman*, 450 B.R. 777, 792 (Bankr. N.D. Ill. 2011) ..................................................... 34, 37

*In re Energy Co-op., Inc.*, 886 F.2d 921, 927 (7th Cir. 1989) ..................................................... 22

*In re Johnston*, 21 F.3d 323, 327 (9th Cir. 1994) ...................................................................... 32

*In re McKay*, 732 F.2d 44, 48 (3d Cir. 1984) ........................................................................... 18

*In re Quay Corp.*, 372 B.R. 378, 385-86 (Bankr. N.D. Ill. 2007) ............................................... 37

*In re Save Our Springs (S.O.S. ) Alliance, Inc.*, 388 B.R. 202, 236 (Bankr. W.D. Tex. 2008).... 34

*In re Sentinel Mgmt. Grp., Inc.* 398 B.R. 281, 301-04 (Bankr. N.D. Ill. 2008)........................... 21

*In re Specialty Equip. Cos.*, 3 F.3d 1043, 1046 (7th Cir. 1993) ................................................. 19

*In re STC, Inc.*, No. 14-41014, 2016 WL 3884799, (Bankr. S.D. Ill. Apr. 7, 2016) ................... 33

*In re Superior Toy & Manufacturing Co.*, 78 F.3d 1169 (7th Cir. 1996) ............................... 10, 21

*In re Wabash Valley Power Ass'n*, 72 F.3d 1305, 1321 (7th Cir. 1995) ......................... 33, 34, 35

*In re Woodbrook Assocs.,* 19 F.3d 312, 317 (7th Cir. 1994) ........................................ 32, 33, 34

*In re Yellow Corp.*, No. 23-11069 (CTG), 2026 WL 908516, (Bankr. D. Del. Apr. 2, 2026). .... 22

*In re Zimmerman*, 276 B.R. 598, 604 (Bankr. C.D. Ill. 2001) ....................................... 18

*Kaye v. A.R.E. Distribution & Alpine Records, LLC (In re Value Music Concepts, Inc.)*, 329 B.R.

111 (Bankr. N.D. Ga. 2005) ........................................................................ 18

*Polite Enters. Corp. Pty Ltd. v. N. Am. Safety Prods., Inc*, No. 13 C 1089, 2014 WL 321668, (N.D.

Ill. Jan. 29, 2014) ................................................................................. 33

*Sure-Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869, 873 (2d Cir. 1991) ............... 17

*United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 263-64 (2010) ................................ 18

**Statutes**

11 U.S.C. § 1122 ........................................................................................... 39

11 U.S.C. § 1122(a) ....................................................................................... 32

11 U.S.C. § 1123(a)(4) .................................................................................... 35

11 U.S.C. § 1123(b)(1) .................................................................................... 17

11 U.S.C. § 1123(b)(3) ................................................................................ 17, 34

11 U.S.C. § 1123(b)(3)(A) ............................................................................. 22, 37

11 U.S.C. § 1123(b)(5) .................................................................................... 17

11 U.S.C. § 1123(b)(6) .................................................................................... 17

11 U.S.C. § 1129(a)(1) ................................................................................ 32, 35

11 U.S.C. § 1129(b)(1) .................................................................................... 36

iv

11 U.S.C. § 1129(b)(2)(B)(ii) ......................................................................................................... 38

11 U.S.C. § 541 ............................................................................................................................. 11

11 U.S.C. § 547(b) ........................................................................................................................ 18

11 U.S.C. §§ 1123(a)(5) ............................................................................................................... 17

**Rules**

Fed R. Bankr. P. 3019 .................................................................................................................... 21

Fed R. Bankr. P. 3019(a) .............................................................................................................. 21

Fed. R. Bankr. P. 7001(a) ............................................................................................................. 18

Fed. R. Bankr. P. 9019 .................................................................................................................. 38

RAS Data Services, Inc., the above-captioned debtor and debtor-in-possession (the "Debtor"), and the Official Committee of Unsecured Creditors appointed in the Debtor's chapter 11 case (the "Committee" and, together with the Debtor, the "Plan Proponents") respectfully submit this Joint Response (this "Response") to the objection (Dkt. No. 320, the "Objection") of CIT Equipment Financing, LLC ("CIT") to confirmation of the *Second Amended Joint Plan of Liquidation of Debtor and the Official Committee of Unsecured Creditors* (Dkt. No. 278, the "Plan").[2] In further support of confirmation of the Plan and this Response, the Plan Proponents have submitted multiple declarations in support of the Plan (collectively, the "Declarations") including the *Declaration of Sandor Jacobson in Support of Settlement with Infinity Transportation 2024, LLC and Its Affiliates as Set Forth in Second Amended Joint Plan of Liquidation of Debtor and Official Committee of Unsecured Creditors, and in Support of Plan Generally* (the "Jacobson Declaration") and the *Declaration of John B. Pidcock in Support of Confirmation of the Plan and Approval of the Infinity Settlement* (the "Pidcock Declaration"), as well as several other declarations filed by the Plan Proponents in support of the Plan (together with the Jacobson Declaration and the Pidcock Declaration, the "Declarations"),[3] and respectfully state as follows.

**PRELIMINARY STATEMENT**

A few months ago, the Plan Proponents and Infinity were entrenched in litigation that, even in a best-case, Estate-wins scenario, would have delayed distributions for years and cost the Estate an estimated million dollars in legal fees and other expenses. Even worse, a loss in the litigation would effectively have handed the Debtor's assets to only a subset of its creditors, at the expense

---

[2] Capitalized terms not otherwise defined herein have the respective meanings ascribed by the Plan.

[3] To the extent the Declarations are not admitted into evidence at the hearing on confirmation of the Plan, the Plan Proponents will adduce live testimony to establish the facts set forth therein.

1

of many others (most notably, CIT), and rendered the Debtor administratively insolvent and incapable of making any distribution on account of general unsecured claims.

In exchange for an approximately $1.6 million improvement upon Infinity's worst-case scenario (without considering the costs and expenses of litigation) and a waiver of avoidance actions that likely would not have been pursued, confirmation of the Plan will result in an immediate *pro rata* distribution to creditors while forgoing the expense, delay, and uncertainty of litigation. Such a swift and complete resolution is only possible, however, with the creditors' collective agreement to waive claims similar those asserted by Infinity in the Adversary Proceeding (i.e., "Owner Trust Claims"). Absent this waiver, the Debtor would find itself litigating the same issues and facing the same risk of an adverse judgment, only with a different plaintiff (or plaintiffs) on the other side of the courtroom.

The overwhelming majority of creditors who voted on the Plan, including creditors who might have asserted colorable Owner Trust Claims in the millions of dollars, agreed to waive such claims. They have agreed to do so because they place substantial value on a prompt initial distribution, as well as valuable consideration given by Infinity under the settlement: Infinity's waiver of distribution rights on account of preserved causes of action that may narrow or even eliminate the gap between Infinity and Class 4 creditors under the Plan.

Only CIT stands in the way—not because it holds a recoverable Owner Trust Claim (which it does not), but because it wants to use Owner Trust Claims defensively, to argue that funds paid for its benefit prior to the Petition Date were not the Debtor's property. Instead, CIT wishes to argue, such funds either belonged to CIT (with respect to funds it paid to the Debtor) or to other railcar Owners (with respect to funds paid to the Debtor by those Owners), notwithstanding the release of such claims by those Owners.

Under the leadership of the Former CEO, CIT (his former employer) enjoyed a relationship with the Debtor unlike those of other railcar Owners. The Debtor maintained a segregated account for funds paid by CIT (the "CIT Account"), whereas funds paid by or on account of other owners were comingled in another account (the "Savings Account"). Jacobson Decl. at 17. And in late May 2025, the Former CEO caused the Debtor to take the unusual step of diverting approximately $10 million from the Savings Account to the CIT Account, from which the Debtor later paid CIT's vendors. *Id*. In other words, less than 90 days before the Petition Date, the Former CEO diverted funds collected from other Owners and used them to make payments on CIT's behalf. Additionally, in mid-June 2025, the Former CEO assisted CIT with paying vendors directly, *id*., which ultimately resulted in the Debtor holding virtually no funds on behalf of CIT on the Petition Date.[4]

These prepetition acts by the Former CEO, as well as the fact that CIT's contract was not assumed and assigned to the purchaser of the Debtor's assets,[5] set CIT apart from other creditors. CIT faces not only considerable preference exposure (to which it could not assert a defense under *In re Superior Toy & Manufacturing Co*., 78 F.3d 1169 (7th Cir. 1996)), but also the possibility of other substantial claims, such as unjust enrichment and equitable subordination. And without an offensive Owner Trust Claim, CIT has less incentive to preserve the fragile balance struck among such claims by the Plan.

---

[4] The balance of the CIT Account as of the Petition Date was $1,176.14. *Schedule A/B*, Dkt. No. 80, Part 1, Question 3.

[5] *See Stipulation and Agreed Order Resolving Motion to Authorize Rejection of Executory Contract with CIT Equipment Financing, LLC in the Event of Future Nonpayment of Management Fees or Further Court Order*, Dkt. No. 114.

In a sense, CIT is, like the Former CEO, gambling with money that does not belong to it. If the Plan is not confirmed, CIT will *not* bear the same consequences as other creditors,[6] so it feels free to venture a meritless roll of the dice, in the hope of minimizing its liability in anticipated post-confirmation litigation. But because the Plan's provisions are consistent with the dictates of the Bankruptcy Code, and because they implement a settlement that is well within the range of reasonableness, the CIT Objection should be denied.

## RELEVANT BACKGROUND

**A.      The Chapter 11 Case**

On August 1, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor has continued to operate as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Committee was appointed on August 15, 2025 (Dkt. No. 69). No trustee or examiner has been appointed in this case.

**B.      The Infinity Adversary Proceeding and Settlement**

On the Petition Date, Infinity—one of the Debtor's largest customers—commenced the Infinity Adversary Proceeding, seeking a declaratory judgment that approximately $10.5 million in funds in the Debtor's possession constituted Infinity's property and were not property of the Estate pursuant to 11 U.S.C. § 541, and seeking imposition of a constructive trust over those funds.[7] Notably, Infinity was the *only* railcar Owner to formally assert such claims in this case,

---

[6] *See Objection of CIT Equipment Financing, LLC to Motion for Entry of Order (I) Scheduling a Combined Hearing on Approval of the Disclosure Statement and Confirmation of the Plan; (II) Conditionally Approving the Disclosure Statement for Purposes of Soliciting Votes on the Plan; (III) Granting Related Relief; and (IV) Shortening Notice Thereof*, Dkt. No. 254, at 2 ("CIT can discern no advantages to this proposed plan over a Chapter 7 liquidation . . . .").

[7] References to "Adv. Dkt." correspond to docket numbers in the Infinity Adversary Proceeding, which remains pending as Adversary Proceeding No. 25-00244.

even though it operated under a management services agreement substantially similar to those of the Debtor's other customers. The Committee intervened in the Infinity Adversary Proceeding and filed a motion for judgment on the pleadings (Adv. Dkt. No. 54, the "MJP").

The Court ultimately denied the MJP in its *Memorandum Opinion Denying the Official Committee of Unsecured Creditors's Motion for Judgment on the Pleadings* (Adv. Dkt No. 86, the "Memorandum Opinion"). In the Memorandum Opinion, the Court laid out the difficulties faced by Infinity in prevailing on the merits and the hurdles associated with its trust claims, but also left the door open for the possibility Infinity could prove its claims.

Following the ruling on the MJP, the Debtor, the Committee, and Infinity engaged in fact discovery and concurrently held settlement negotiations, including through a mediation conducted by the Honorable Deborah Thorne in February 2026. While the mediation did not immediately result in a settlement, the parties continued to engage in discussions, culminating in a settlement in principle committed to an executed term sheet in mid-May 2026. The Plan incorporates and effectuates the Plan Proponents' settlement with Infinity (the "Infinity Settlement"), the terms of which are described in section B(1) ("Terms of the Infinity Settlement") below, and in the Jacobson Declaration.

**C.     The Plan**

Before the Infinity Adversary Proceeding was resolved, the Debtor and the Committee filed their *Joint Plan of Liquidation of Debtor and Official Committee of Unsecured Creditors* (Dkt. No. 251, the "Initial Plan"). The Initial Plan presumed that the Infinity Adversary Proceeding would be tried, and therefore provided for alternate forms of treatment to Infinity (separately classified in Class 2) depending on the outcome of the litigation. Similarly, general unsecured creditors, classified in Class 4, had several alternate treatments presented depending on the

5

outcome of the Infinity litigation. Importantly, (i) the Initial Plan incorporated an Owner Trust

Claims reconciliation procedure that would trigger in the event Infinity prevailed at trial (thereby

allowing any other owner to assert and prove up similar claims), and (ii) no distributions would be

made to Class 4 creditors until the Infinity Adversary Proceeding was resolved by Final Order (i.e.,

after exhaustion of all appeals).

CIT filed an objection to conditional approval of the Initial Plan's disclosure statement.

Dkt. No. 254. Predictably, CIT—the one railcar Owner that *does not* have an Owner Trust Claim

as against the Savings Account[8]—insisted that if the Plan Proponents prevailed at trial, it would

be unreasonable for the Debtor to reserve any funds for Owner Trust Claims other than Infinity's

pending an appeal. *Id*. ¶ 2. Instead, CIT asserted that all creditors should "promptly receive a

distribution," *id*., presumably cutting off any ability for Owner Trust Claims to be paid if the

judgment was later reversed. None of the Debtor, Committee, or their respective professionals

supported disbursing funds without a final and non-appealable order and believed such an

approach would be unconfirmable.

Based on a misreading of the Initial Plan, CIT also objected to what it believed was a

proposed release of all Committee members (and was, in fact, a proposed release of the individual

representatives of those members). Rather than releasing only certain creditors, CIT stated that it

> **would have no objection to all creditors, or all creditors voting in favor of the Plan, receiving releases for causes of action arising from pre-petition conduct that does not involve actual fraud**. After all, nearly all of the Holders of Allowed General Unsecured Claims, including CIT, are the innocent victims of fraud who should not be subjected to further claims. But all creditors should be treated alike— either all should receive releases for pre-petition causes of action or none should.

---

[8] As described in the Jacobson Declaration and below, CIT's vendor payables were held in a segregated account, from which several large transfers were made directly to CIT in May 2025. In mid-June, CIT began paying its vendors directly. Thus, as of the Petition Date, the Debtor held virtually no funds in which CIT could assert a property interest through the tracing of funds.

Id. ¶ 5 (emphasis added). *Notably absent from this suggestion was any requirement to assess the value of the claims being released.* Apparently, from CIT's perspective, a mere vote in favor of the Initial Plan would have been sufficient consideration to garner a release, including a release of CIT, regardless of the magnitude of the Estate's claims. Whether CIT was aware of the $10 million transferred from the Savings Account to the CIT Account at the time it filed that objection is currently unknown. In any event, the Court ultimately overruled CIT's objection to conditional approval of the Initial Plan's disclosure statement, stating that it actually amounted to an objection to confirmation.

On May 6, 2026, once Infinity and the Debtor agreed to a settlement in principle but before they executed a term sheet, the Plan Proponents filed their *First Amended Joint Plan of Liquidation of Debtor and Official Committee of Unsecured Creditors* (Dkt. No. 270, the "First Amended Plan"), and an accompanying disclosure statement, Dkt. No. 271. The First Amended Plan incorporated the terms of the anticipated settlement, including the proposed release of Infinity.

At a status hearing the following week, CIT expressed some concerns with the First Amended Plan. The Plan Proponents accepted the Court's offer of a five-day continuance to attempt to work through CIT's issues, in the hope of averting a contested confirmation hearing. During that period, counsel to CIT sent the Plan Proponents' counsel a four-page, single-spaced list of requests for modifications to the First Amended Plan; nowhere on the list, however, was any disagreement with the terms of the Infinity Settlement. The Plan Proponents and Infinity proceeded to execute their term sheet later the same day.

The Plan Proponents were unable to agree to all of CIT's requests, but did accept several of them. To implement the resulting changes, as well as some other corrections to the First Amended Plan, the Plan Proponents filed a second amended plan, *i.e.*, the Plan, as well as an

7

accompanying *Disclosure Statement for the Second Amended Joint Plan of Liquidation of Debtor and Official Committee of Unsecured Creditors* (Dkt. No. 279, the "Disclosure Statement").

In light of the resolution of the Infinity Adversary Proceeding, the Plan (and the First Amended Plan before it) had to approach the Owner Trust Claims differently from the Initial Plan, so as to ensure that prompt initial distributions could be made following the Effective Date. The Plan represents a settlement of all such claims, and provides that any Owner accepting a distribution under the Plan is deemed to have waived any right to assert—whether offensively or defensively—an Owner Trust Claim. Plan §§ 8.1, 11.3 (enjoining assertion of any defense to an obligation, debt, or liability due to the Debtor that would be deemed to constitute an Owner Trust Claim).

Supplementing the waiver of Owner Trust Claims in section 8.1 is a separate provision stating that any Holder of an Owner Trust Claim who accepts a distribution under the Plan is deemed to have acknowledged that: (a) any Owner Trust Claim the Holder has asserted or could have asserted is deemed disallowed; (b) the Holder accepts a *pro rata*, *pari passu* distribution as a Class 4 General Unsecured Creditor; and (c) the Holder has irrevocably waived any assertion of ownership over, or entitlement to a constructive trust encompassing, any property in the Debtor's possession. *Id*. § 8.2.[9]

---

[9] The First Amended Plan stated these acknowledgements were made by parties voting in favor of acceptance. In contrast, as revised, the Plan states the acknowledgments are instead made by parties accepting distributions under the Plan. The Disclosure Statement contains two descriptions of the acknowledgement, one of which inadvertently retains the language of the First Amended Plan. *Compare* Disclosure Statement, Dkt. No. 279, at 12 (providing the acknowledgement is made by parties voting to accept), *with id.* at 31 (providing the acknowledgement is made by parties accepting a distribution). Because, however, the Plan controls in the event of a conflict with the Disclosure Statement, Plan § 13.5, the acknowledgement clearly applies to parties who accept a distribution. And in any event, section 8.2 is largely a belt-and-suspenders provision; section 8.1 effectuates the waiver regardless of a creditor's vote or acceptance of a distribution.

Additionally, the Plan provides that the Plan Proponents may withdraw the Plan and pursue confirmation of the Initial Plan if owners assert Owner Trust Claims. *Id.* § 8.3. There is a clear trade-off for creditors: in exchange for a material initial distribution within 35 days of the Effective Date, Owner Trust Claims must be extinguished for all purposes.

This extinguishment must extend equally to all Owner Trust Claims, whether they are raised offensively (*e.g.*, asserting a claim to recover funds held by the Estate) or defensively (*e.g.*, defending preference liability on the basis that prepetition transfers by the Debtor were not transfers of the Debtor's property). Otherwise, the Plan would pose the risk of inconsistent and unfair outcomes, based merely on the procedural posture of a given dispute; property cannot belong to one owner for purposes of a claim, but belong to another for purposes of a defense. Instead, the waiver of Owner Trust Claims is intended to serve as a determination, at least with respect to parties bound by the Plan, that the funds held by the Debtor (aside from those subject to Erroneous Payment Claims, which are dealt with separately) are property of the Estate.

The settlement underpinning the Plan has garnered broad support among the creditor body. Indeed, only one creditor has expressly criticized the Owner Trust Claim defense waiver set forth in section 11.3 of the Plan, and that is CIT. Aside from CIT, a single creditor, Progress Rail Services Corporation, voted to reject the Plan and filed a limited objection to confirmation based on narrow issues unrelated to Owner Trust Claims. The Plan Proponents have subsequently resolved this objection, however, such that based on the inclusion of certain language in the proposed confirmation order, Progress Rail has agreed not only to withdraw its objection, but also to change its vote to accept the Plan. With this change in Progress Rail's vote, all creditors voting on the plan other than CIT have voted in favor of acceptance. As set forth below, the Plan satisfies

9

confirmation standards on its face, but the context of CIT's position should inform evaluation of its Objection.

## ARGUMENT

**A.    The Plan may extinguish Owner Trust Claims, whether they are asserted offensively or defensively.**

**1.    The Plan is determining what constitutes property of the Estate, not adjudicating an adversary proceeding.**

One of the most basic functions of a Chapter 11 plan is to dispose of property of the estate. It follows that a plan must be able to determine what is, or is not, estate property. *See Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110, 118 (2d Cir. 2014) ("Determination of the ownership of assets is at the core of the bankruptcy process, and particularly the creation of a bankruptcy reorganization plan, which involves 'a schedule of all [the debtors'] liquid assets and liabilities' and thereafter operates, with full preclusive effect, to 'bind its debtors and creditors as to all the plan's provisions, and all related, property or non-property based claims which could have been litigated in the same cause of action.") (quoting *Sure-Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869, 873 (2d Cir. 1991)); *see also Baeshen v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c))*, 520 B.R. 15, 23 (Bankr. S.D.N.Y. 2014) ("While it is true that a party has the right to contest what constitutes property of the estate, this issue was resolved in the plan of reorganization that was approved by the Confirmation Order. This is hardly surprising, given that an understanding of what constitutes property of the estate is central to determining the distribution to creditors in any plan of reorganization.").

Indeed, where a plan contemplates distributing the estate's funds to creditors, a determination that such funds constitute property of the estate is not merely an option; it is a prerequisite to the Court's exercise of jurisdiction. *See In re Dernick*, 624 B.R. 799, 816, 822

10

(Bankr. S.D. Tex. 2020) (noting that, with one exception applicable in individual cases, "[a] plan . . . may administer only estate property," and that the plan's "administration of anything other than Estate Property is forbidden by the Bankruptcy Code").

Barring Owner Trust Claims is therefore a perfectly appropriate exercise of the Court's power to confirm the Plan. Authority for doing so can be found in multiple sections of the Bankruptcy Code. *See, e.g.*, 11 U.S.C. §§ 1123(a)(5) (requiring a plan to provide "adequate means for the plan's implementation"); 1123(b)(1) (allowing a plan to "impair . . . any class of claims, secured or unsecured, or of interests"); 1123(b)(3) (allowing for the "settlement or adjustment of claim or interest belonging to the estate"); 1123(b)(5) (allowing a plan to "modify the rights of holders of secured claims . . . or of holders of unsecured claims"); 1123(b)(6) (allowing a plan to "include any other appropriate provision not inconsistent with [the Bankruptcy Code]").

Notwithstanding the raft of authority permitting (and in many instances requiring) a plan to determine what constitutes property of the estate, CIT attempts to argue that such a determination violates Bankruptcy Rule 7001. CIT evidently reasons that because preference actions are adversary proceedings, and preference actions require a transfer of the debtor's property, then in order to make a binding determination about what constitutes the debtor's property, a bankruptcy court must first adjudicate an adversary proceeding.

CIT claims that "plans that attempt to adjudicate issues requiring adversary proceedings cannot be confirmed." Obj. at 6. But the cases it cites did not involve the mere adjudication of "issues" bearing upon adversary proceedings; in those cases, plans purported to adjudicate *entire causes of action. See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 263-64 (2010) (discharging student loan); *In re Comm. W. Fin. Corp.*, 761 F.2d 1329, 1336-37 (9th Cir. 1985) (avoiding unperfected lien); *In re McKay*, 732 F.2d 44, 48 (3d Cir. 1984) (avoiding judicial lien

11

that impaired an exemption); *In re Zimmerman*, 276 B.R. 598, 604 (Bankr. C.D. Ill. 2001) (avoiding lien for a reason other than lack of collateral value); *In re Beard*, 112 B.R. 951, 955-56 (Bankr. N.D. Ind. 1990) (avoiding lien based on its validity or extent).[10]

Plainly, the Plan is not attempting to do what these cases forbid; the Plan is not adjudicating CIT's liability for preferences or any other claims. Instead, the Plan is making a determination of one discrete issue: the Debtor's ownership of property. Claiming such a discrete determination requires an adversary proceeding (in fact, to follow CIT's logic, an adversary proceeding against not just CIT, but every other party whose claims or defenses are impacted) is unsupported by authority and would be utterly unworkable in practice.

CIT may disagree with the manner in which the Plan determines property of the Debtor, but that does not mean the Plan is incapable of making such a determination. No other creditor has objected, and because the Plan has obtained the requisite votes and satisfied the other requirements for confirmation, the Plan will be binding on CIT upon confirmation, just like all other creditors. *See In re Specialty Equip. Cos.*, 3 F.3d 1043, 1046 (7th Cir. 1993) ("The provisions of the confirmed plan bind all creditors whether or not a particular creditor has voted to accept the plan.").

**2.    CIT does not speak on behalf of other creditors; it occupies a materially different position.**

In its Objection, CIT seems to suggest it opposes the Plan not merely out of its own self-interest, but also as a champion for some other, vaguely identified creditors. *See, e.g.*, Obj. at 2 (claiming it chose not to advance an affirmative Owner Trust Claim due to its belief "that victims should share *pro rata* in the funds remaining with Debtor"); 5 (decrying the cost and liability faced

---

[10] CIT cites another case, *Kaye v. A.R.E. Distribution & Alpine Records, LLC (In re Value Music Concepts, Inc.)*, 329 B.R. 111 (Bankr. N.D. Ga. 2005), that it claims is "similar as to preference issues," Obj. at 7. But that case concerned a plan's attempt to reserve preference claims, not to adjudicate them. *Kaye*, 329 B.R. 116-18.

by "CIT and fifty-three other creditors"); *id*. (referring to "creditors"—plural—voting to reject the Plan); 10 (criticizing the Plan for removing key defenses of "CIT and others"). CIT even hints that the Committee does not adequately represent the interests of the creditor body. *Id*. at 9.

While there is nothing wrong with CIT acting in its own interests, its rhetoric belies the fact that it is profoundly alone in its opposition to the Plan. Even before Progress Rail withdrew its objection and changed its vote, the vast majority of votes were cast in favor of the Plan. Now, however, it can be said that literally every voting creditor other than CIT supports confirmation.

CIT's opposition to the Plan is not the only feature that sets it apart from other creditors. CIT has repeatedly emphasized to this Court that it required a segregated account for deposits of funds attributable to CIT's lessees, that it exercised control over vendor payments from those accounts, and that it expects to have "stronger arguments than others" to ownership of the Debtor's funds by reason of its segregated-account requirements. Obj. at 2. It remains unclear what these arguments are; CIT has not articulated them, and certainly not in manner warranting derailing of the Plan. And to the contrary, having a segregated account into which the Former CEO deposited $10 million in funds collected for other Owners, if anything, weakens its claim to ownership of those funds.

One point, however, is clear: *CIT is the only railcar owner whose transactions flowed through a segregated deposit account*. All other owners, including Infinity, had their transactions run through a common account (*i.e*., the Savings Account) and commingled. CIT's distinct account structure materially affected the factual and legal posture of any trust, ownership, or preference issues as between CIT and the Debtor. CIT cannot credibly assert that it is uniquely protected when defending itself against potential avoidance claims and *simultaneously* insist that Infinity and all other Owners must be treated as indistinguishable for purposes of classification and settlement.

13

The Plan Proponents respectfully submit that CIT's position is internally irreconcilable. If anything, the Plan could have separately classified CIT, but the Plan Proponents believed such treatment would only invite more consternation from CIT.

CIT is also unique in the liability it faces. As noted above and described in more detail in the Jacobson and Pidcock Declarations, in late May 2025, the Former CEO transferred roughly $10 million from the Savings Account to the CIT Account, with these funds later paid to vendors on CIT's behalf. While a thorough investigation into the circumstances of this transfer has not been conducted, they raise the distinct likelihood that CIT is liable for claims other than a garden-variety preferential transfer, such as unjust enrichment or equitable subordination.

Another difference between CIT and most other Owners concerns CIT's preference liability. Most Owners allowed their MSAs to be assumed and assigned to the purchaser of substantially all of the Debtor's assets. Under the Seventh Circuit's ruling in *Superior Toy*, 78 F.3d at 1176, preference actions typically do not lie against parties whose contracts have been assumed. And while the Plan Proponents have not yet definitively ascertained the application of *Superior Toy* to all of the counterparties to assumed MSAs in this case (and therefore reserve all rights), the Plan Proponents nonetheless acknowledge the case is binding precedent, and do not intend to pursue claims that it forecloses. CIT, on the other hand, did not have its MSA assumed. To the contrary, CIT expressly requested that its MSA be rejected prior to the sale of the Debtor's assets. CIT therefore cannot raise any defense based on *Superior Toy*.

CIT's unique position in this case means it is not well situated to purport to speak on behalf of other Owners, or to dictate how the Plan Proponents should resolve disputes with Owners whose funds were diverted for its benefit.

**3.    The Court may "blue-pencil" the Plan if the waiver of Owner Trust Claim defenses is deemed to be inappropriate.**

The Plan Proponents submit that the Plan's waiver of defensive Owner Trust Claims constitutes an equitable means of furthering the Plan's objectives, and is consistent with the dictates of the Bankruptcy Code. But if the Court ultimately disagrees, it would be wholly unnecessary, and a waste of Estate resources, to require the Plan to be re-noticed or re-solicited.

Under Bankruptcy Rule 3019, a pre-confirmation modification to a plan is "deemed accepted by all creditors . . . who have previously accepted the plan" if, after a hearing, the court determines the modification "does not adversely change the treatment of the claim of any creditor . . . who has not accepted in writing the modification." Fed R. Bankr. P. 3019(a); *see also In re Sentinel Mgmt. Grp., Inc*. 398 B.R. 281, 301-04 (Bankr. N.D. Ill. 2008) (interpreting the rule and statutory scheme to require materiality, in addition to adversity). Further, despite some opaque statutory language on the issue, "courts do not require notice of a modification if the modification does not adversely change a claimant's treatment." 4 *Norton Bankr. L. & Prac.* 3d § 111:1 (William L. Norton III, ed.) (collecting cases).

As briefly addressed at the last status hearing in this case, removing the waiver of Owner Trust Claim defenses would not materially and adversely affect creditors who have voted to accept the Plan. In fact, such creditors would be affected positively, albeit at the expense of the Estate.

**B.    The Infinity Settlement satisfies the requisite standards for approval.**

Under section 1123(b)(3)(A) of the Bankruptcy Code, a plan may include the settlement of a claim belonging to the estate. In the Seventh Circuit, the benchmark for assessing such a settlement is whether it is in the best interests of the estate. *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007).  The "linchpin" of this analysis, in turn, is a "comparison of the value of the settlement with the probable costs and benefits of litigating." *Id*.  Courts consider

factors such as "the litigation's probability of success, complexity, expense, inconvenience, and delay." *Id.*

As part of this test, "the value of the settlement must be reasonably equivalent to the value of the claims surrendered." *Id*.  Reasonable equivalence is satisfied "if the settlement falls within the reasonable range of litigation outcomes." *Id*.; *see also In re Energy Co-op., Inc*., 886 F.2d 921, 927 (7th Cir. 1989) ("A challenged settlement fails this test only if it 'falls below the lowest point in the range of reasonableness.'") (internal citation and alteration omitted). Bankruptcy judges do not "rubber stamp" a proposed settlement, but do afford a measure of deference to the business judgment of the debtor. *In re Yellow Corp.*, No. 23-11069 (CTG), 2026 WL 908516, at *14-15 (Bankr. D. Del. Apr. 2, 2026).

Each of the factors examined by courts in the Seventh Circuit favors approval of the Infinity Settlement:

### 1.      Terms of the Infinity Settlement

The terms of the Infinity Settlement, including the "value of the settlement" applicable to its evaluation, *Doctors Hosp.,* 474 F.3d at 426, are as follows: (a) Infinity will have an allowed claim in the amount of $10,580,272.00, which is equal to the amount scheduled by the Debtor without dispute and filed by Infinity, rounded up by one cent for administrative convenience (the "Infinity Claim"); (b) in full satisfaction of its claim, Infinity will receive and accept a distribution in the amount of $5.6 million (approximately 53% of its allowed claim), plus its *pro rata* share of any Class 3 Erroneous Payment Claims, if any, and Victim Recovery Funds, if any (the "Infinity Settlement Payment"), but otherwise waive the right to any further distributions under the Plan, including recoveries from Causes of Action brought on behalf of the Estate; (c) Infinity will withdraw its motion to convert this case to a case under chapter 7 of the Bankruptcy Code; (d)

16

Infinity will dismiss the Infinity Adversary Proceeding, with prejudice; (e) all prior restrictions imposed on the Debtor's use of approximately $9.5 million of funds to which Infinity asserted it could trace an Owner Trust Claim will be lifted; and (f) the Debtor, its Estate, and the Committee, on the one hand, and Infinity, on the other, will release one another from all "Claims" and "Causes of Action," including Avoidance Actions against Infinity.

Furthermore, the settlement's term sheet: (a) committed Infinity to supporting the Plan; and (b) resolved and reconciled certain: (i) post-petition receipts of funds the Debtor collected for rent, repairs, or usage associated with railcars owned by Infinity ("Sideways Funds"); and (ii) management fees owing from Infinity to the Debtor. The foregoing resolution and reconciliation resulted in a transfer of funds to Infinity in the amount of $167,454.58 from these Sideways Funds and an acknowledgment by Infinity of the legitimacy of all management fees due and owing from Infinity to the Debtor in the amount of $140,033.33, coupled with the right of the Debtor to retain Sideways Funds in this amount and apply them as management fees for its own account, without the need to litigate.[11]

### 2.   Litigation's Probable Costs and Benefits

The terms of the Infinity Settlement outweigh the probable costs and benefits of continuing to litigate the Infinity Adversary Proceeding because (i) the probability of success on the merits is difficult to ascertain under the current stage of the proceeding, notwithstanding the Memorandum Opinion; (ii) the Infinity Settlement is well within the reasonable range of outcomes in the Infinity

---

[11] Because the underlying actions contemplated by this arrangement—deduction of management fees from postpetition collections and remittance of the balance to the appropriate customer—were expressly authorized by the *Order Authorizing Post-Petition Operating Procedures Outside the Ordinary Course of Business*, Dkt. No. 63, no further Court authorization was needed for its implementation. *See In re Garrett*, 494 B.R. 336, 341 n.4 (Bankr. N.D. Ill. 2013) ("[T]he bankruptcy court need not approve a settlement under Rule 9019 unless the 'underlying action' the debtor seeks to accomplish is one that needs court approval.") (quoting *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1994)).

Adversary Proceeding; (iii) the complexity of the Infinity Adversary Proceeding must take into account the possibility that the Debtor will not have funds to litigate the Infinity Adversary Proceeding in the first instance, and a loss in the litigation would: (A) result in unacceptably disparate treatment between those creditors who could and could not trace funds; (B) render the Debtor without the ability to appeal; and (C) eliminate the Debtor's ability to bring certain Causes of Action predicated on transfers of Estate property; and (iv) the expense of litigating would consume substantial Estate recourses (consuming any incremental benefit to be gained from a successful outcome) and delay distributions to Class 4 creditors for an undetermined period of time.

### a.      Litigation's Probability of Success on the Merits

It must be acknowledged that the Memorandum Opinion expressed skepticism about the merits of the Infinity Adversary Proceeding and contained language favorable to the Debtor and the Committee in the ultimate disposition of the Infinity Adversary Proceeding. At the same time, the Memorandum Opinion stated on multiple occasions that the Court was ruling based only on what was in front of it at the time the Memorandum was prepared, and held that it was plausible for Infinity to establish the Debtor was an agent of Infinity at trial. Furthermore, the Memorandum Opinion noted that if Infinity is successful in the Infinity Adversary Proceeding, Infinity and others could seek to trace funds held by the Debtor, potentially removing from the Estate all cash in the Debtor's possession.

In response to discovery requests by Infinity, the Debtor produced various emails in which representatives of the Debtor communicated to third parties, indicating they were collecting money as "agent" for Infinity. Additionally, various checks payable to the Debtor contain language indicating the payor was remitting funds to the Debtor in its capacity as "agent." While not

18

conceding the ultimate issue, it is possible these communications could have a negative impact on the Infinity Adversary Proceeding from the perspective of the Debtor. These emails and checks were not considered by the Court when ruling on the MJP.

Furthermore, no depositions have been taken in the Infinity Adversary Proceeding. It is unclear whether the Former CEO would provide testimony given his alleged criminal conduct and his rights to invoke the 5th Amendment to the U.S. Constitution. Even if the Former CEO testified, the exact nature of his testimony is unknown, and it is unclear whether his testimony would be deemed credible in any event. The Former CEO could be a critical witness in the Infinity Adversary Proceeding, but he has not offered information related to the Infinity Adversary Proceeding post-petition and has not been deposed under oath, despite the Court granting the Committee's request to conduct a Bankruptcy Rule 2004 examination.

Finally, the Debtor's Statement of Financial Affairs reflects gross revenue in 2023 in the approximate amount of $5.5 million; in 2024 in the approximate amount of $5.7 million; and 2026 year to date through the Petition Date of $3.3 million. Dkt. No. 82, at Part 1, Question 1. The 2023 and 2024 gross revenue amounts are derived from Form 1120-S line 1(a) titled Gross Receipts or Sales on the Debtor's federal tax returns. While it is unknown whether the Court would view the Debtor's disclosures or tax returns as dispositive on the ultimate legal issue of Estate property in the funds held by the Debtor, these gross receipts disclosures are far less than the approximately $500 million in funds that flowed through the Debtor's bank accounts on an annual basis.

Accordingly, while it is impossible to predict the probability of success on the merits at this stage of the Infinity Adversary Proceeding with exact precision, there is a material risk Infinity would prevail if the Infinity Adversary Proceeding were litigated to a final judgment.

19

### b.      Range of Litigation Outcomes

The Infinity Settlement Payment is well within the range of reasonable litigation outcomes in the Infinity Adversary Proceeding. Even if the Debtor and the Committee prevailed in the Infinity Adversary Proceeding, Infinity would still be entitled to assert a general unsecured claim in the amount of the Infinity Claim (*i.e.*, $10,580,272.00). The Infinity Claim is estimated to be entitled to a *pro rata* distribution in the amount of approximately $3,940,624, before factoring into account the costs of litigation. This amount is calculated by: (a) adding the Infinity Claim to the estimated Class 4 claims pool of $32,629,245.00 as set forth in the Disclosure Statement to create a total general unsecured claims pool of $43,209,517.00 ($32,629,245.00 + $10,580,272.00); (b) dividing the estimated amount of $16,093,390 as cash available for distributions to Class 4 general unsecured claims by the general unsecured claims to determine a *pro rata* percentage of 37.25% ($16,093,390 / $43,209,517.00 = 37.25%); and (c) multiplying the *pro rata* percentage of 37.25% against the Infinity Claim to arrive at $3,940,624.  This amount is a reasonable baseline of what Infinity could receive if the Infinity Adversary Proceeding were litigated and the Debtor and Committee prevailed (again, without factoring in costs of litigation).

On the other hand, if the Debtor and the Committee lost in the Infinity Adversary Proceeding, Infinity would readily be able to trace at least $7.2 million of funds held by the Debtor. These funds consist of: (a) $5.3 million of funds transferred directly by Infinity to the Debtor ("Top-Down Funds") on July 17, 2025; (b) $800,000 in Sideways Funds from July 11, 2025, through July 31, 2025; and (c) $1.08 million in Sideways Funds collected by the Debtor on July 8, 2025. Infinity could readily trace these funds because the Debtor did not spend them after receipt, and they remained readily identifiable on the Petition Date. When Mr. Jacobson was appointed as CRO (and to other corporate offices) on July 11, 2025, he imposed a moratorium on remitting

20

funds to the Debtor's vendors and customers, effectively freezing funds in the Debtor's possession other than using management fees to pay the Debtor's internal operating expenses. Further, the Former CEO did not cause the Debtor to disburse any payments to customers or vendors after July 2, excepting *de minimis* payments.

Shortly after the Petition Date, the vast majority of funds in the Debtor's possession that did not constitute management fees, aggregating to approximately $20 million, were segregated into a "Pre-Petition Funds Account," thereby providing a source of funds into which creditors with Owner Trust Claims could trace if the Court ruled these funds do not constitute property of the Estate. The fact that $6.1 million of Top-Down Funds and Sideways Funds came in from or for the benefit of Infinity after the imposition of the moratorium, together with $1.08 million of Sideways Funds collected in the first ten days of July that were not spent, collectively suggest that Infinity could readily trace the Infinity Claim to these funds.

Further, Infinity could arguably trace an additional $2.1 million of Sideways Funds collected by the Debtor with respect to Infinity railcars in June of 2025 given the proximity to the Petition Date and the fact that the Debtor's bank account balance did not dip below $2.1 million. Thus, the amount Infinity could receive if the Infinity Adversary Proceeding were litigated in its favor ranges between $7.2 million and $9.3 million.

In summary, the Infinity Settlement Payment of $5.6 million falls within the range of reasonable litigation outcomes of: (a) $3,940,624 if the Debtor and the Committee won and (b) $7.2 to $9.3 million if the Debtor and Committee lost.

CIT complains in its Objection that the Plan Proponents have failed to submit "evidence" of the methodology behind their valuation of the claims released by the Infinity Settlement. Obj. at 10. But the time has not yet come for either party to make an evidentiary showing. At that time,

21

*i.e.*, the confirmation hearing, the Plan Proponents will indeed introduce evidence of the valuation of the released claims.

### c. Litigation's Complexity

The Litigation's complexity has several nuances consisting of the following concerns: (A) whether the Estate has resources to pay for the litigation in the first place; (B) litigating and losing the Infinity Adversary Proceeding would result in widely disparate treatment among creditors; (C) litigating and losing the Infinity Adversary Proceeding would render the Estate without assets to prosecute an appeal; and (D) litigating and losing the Infinity Adversary Proceeding could eliminate the Debtor's ability to bring certain Causes of Action that could generate additional funds for general unsecured creditors.

First, in the event the Plan is not confirmed and the Infinity Adversary Proceeding must proceed to litigation, it is unclear whether the Estate has resources to litigate. The mere existence of the Infinity Claim and Owner Trust Claims cast doubt over whether any funds in the Debtor's possession constitute property of the Estate, and whether the Debtor is authorized to use such funds. As a result, the Debtor has sought and obtained approval of the Bankruptcy Court and creditors of the Estate on five separate occasions to use funds in its possession, pursuant to a budget, to administer the Bankruptcy Case. *See* Dkt. Nos. 109, 197, 214, 248, 269. The most recent budget was approved by the Court on April 28, 2026, and runs through the end of July 2026. See Dkt. No. 269. That budget was largely in conjunction with pursuing the Plan and Disclosure Statement, and contained specific references to the Infinity Settlement, and sought use of funds to finalize, propose, and seek confirmation of the Plan. *Id*. The Order approving that budget also (a) restricted the use of approximately $9.5 million of funds on hand until resolution of the Infinity Adversary Proceeding; and (b) authorized the Debtor to open a new bank account and to segregate

22

funds comprising Erroneous Payment Claims (as defined in the Plan) and precluded use of those funds absent further order of Court. *Id*.

If the Plan is not confirmed and the Debtor must litigate the Infinity Adversary Proceeding, the Debtor will be required to seek another budget authorizing the use of funds for litigation purposes. There is no economic incentive for Infinity to consent to using these earmarked funds to pay for the litigation against it, nor is there much economic incentive for holders of Erroneous Payment Claims to allow funds set aside for them to be consumed in the Infinity Adversary Proceeding.

Similarly, there are no assurances holders of Owner Trust Claims will approve any further budgets after a failed confirmation. And because the Infinity Claim, Erroneous Payment Claims, and Owner Trust Claims consume the entirety of funds in the Estate, the Debtor does not have the unilateral authority to pay fees for litigating the Infinity Adversary Proceeding. Without sufficient consent to use funds for litigation, there is a reasonable chance Infinity would prevail in the Infinity Adversary Proceeding by default. If this outcome occurred, CIT would not receive a distribution because has no tracing argument against funds held by the Debtor; all funds in the CIT Account were depleted prior to the Petition Date. A Chapter 7 trustee would face a similar dilemma and have no better standing to use funds held by the Debtor for any purposes absent such approval.

Second, litigating the Infinity Adversary Proceeding could result in unacceptably disparate treatment among creditors. The ripple effects of an adverse ruling in favor of Infinity in the Infinity Adversary Proceeding would result in creditors receiving widely disparate treatment based on which creditors can trace funds, notwithstanding that virtually all creditors have suffered similarly from the alleged acts of the Former CEO. Because the Debtor's business operations were substantially similar among all customers other than CIT, the outcome of the Infinity Adversary

Proceeding would be equally applicable to the Owner Trust Claims. And while holders of Owner Trust Claims have apparently been content to sit on the sidelines and watch the Infinity Adversary Proceeding, it is reasonable to infer an adverse ruling would create economic incentive for holders of Owner Trust Claims to assert substantially similar claims and legal theories as those set forth in the Infinity Adversary Proceeding. Those creditors who can trace funds will presumably receive the amount which they can trace; those creditors who cannot trace funds will not receive any funds.

Third, an adverse ruling would render the Debtor without the financial resources to appeal such decision. Upon an adjudication that funds in possession of the Debtor are not property of the Estate, there would be no money in the Estate. Such depletion of the Debtor's funds would essentially render the Debtor without sufficient resources to appeal or challenge an adverse ruling.

Fourth, an adverse ruling would likely eliminate the Estate's ability to bring certain Causes of Action that would otherwise be for the benefit of general unsecured creditors. Because an adverse ruling would determine funds held by the Debtor are not property of the Estate, the Estate would not be able to pursue any Avoidance Actions or other Causes of Action predicated upon the Debtor having a legal interest in improperly transferred funds. The Debtor has identified potential Causes of Action against CIT in the collective amount of approximately $21 million. As addressed above, one such potential Cause of Action arises in part from CIT improving its position by approximately $10 million when the Former CEO caused funds in this amount to be transferred from the Savings Account into the CIT Account, and then to be paid to vendors on CIT's behalf.

Under the Plan, Infinity has waived the right to receive any further distributions from Causes of Action, including any claims against CIT. It was not until Infinity agreed to waive such distributions that the Debtor and Committee agreed to the Infinity Settlement. Accordingly, any successful resolution of the Causes of Action against CIT, whether through payment by CIT to the

24

Estate, waiver of CIT's claim, or a combination of both would create substantial value to general unsecured creditors. Thus, it is conceivable that general unsecured creditors could receive a higher *pro rata* distribution under the Plan than Infinity.

### d.    Litigation's Attendant Expense, Inconvenience, and Delay

The range of fees, costs, and expenses costs of litigating the Infinity Adversary Complaint likely aggregate to a range between $600,000 and $800,000, although that amount could be significantly higher considering the costs incurred in the Infinity Adversary Proceeding to date.

Furthermore, the methodology to conduct a tracing analysis is not agreed between the Debtor and Infinity and would likely require expert testimony in the form of forensic accountants. At one point, it was suggested to the Court that a trial could be bifurcated into liability and damages, such that a forensic accounting would only be needed if it were determined funds in the possession of the Debtor was determined not to comprise Estate property. The Court indicated it was not inclined to bifurcate the trial, so it is likely expert testimony would be required. Given the Debtor's lack of conventional systems and batching of payments, forensic accountants could cost $250,000.

Focusing solely on the Infinity Claim and Plan as filed, the net amount of the Infinity Settlement could be approximately $950,000 more than it would receive if the Debtor were to prevail in Infinity Adversary Proceeding without appeal. The mathematical impact of the $950,000 spread across the claims pool of $43,209,517.00 is $0.02 per $1.00 of claim (two cents on the dollar). In the event litigation costs twice as much as initially estimated, such as $1.5 million or worse, then it is possible that any incremental value from prevailing at trial would be completely erased.

25

Under the Initial Plan, creditors were to have received distributions only after a final order (*i.e.*, an order entered by any court of competent jurisdiction not subject to appeal) was entered. Admittedly, that meant a distribution under the Initial Plan might not have been made for years. On the other hand, with the Debtor, Committee, and Infinity reaching an agreement on the Infinity Settlement, the Plan, if approved, will cause payments to be made to general unsecured creditors thirty-five (35) days after the Effective Date. The overwhelming number of creditors who voted to accept the Plan over those who did not (without giving effect to dollar amounts) as an indication creditors would prefer the proverbial bird in hand over two in the bush. That is to say, finality has been accorded substantial value by creditors.

**C.    Infinity's classification is appropriate.**

Section 1122(a) of the Bankruptcy Code provides that a plan may place a claim in a particular class "only if such claim . . . is substantially similar to the other claims . . . of such class." 11 U.S.C. § 1122(a). Section 1129(a)(1) requires that the plan comply with the applicable provisions of the Bankruptcy Code, including the classification rules. However, section 1122(a) does not require that all substantially similar claims be placed in the same class. *In re Woodbrook Assocs.,* 19 F.3d 312, 317 (7th Cir. 1994); *In re Johnston*, 21 F.3d 323, 327 (9th Cir. 1994). A plan proponent "possesses considerable, but not complete, discretion to classify claims and interests in its Chapter 11 plan of reorganization." *Woodbrook*, 19 F.3d at 317.

A plan proponent may not separately classify claims for the purpose of "gerrymandering an affirmative vote on reorganization," but separate classification is appropriate: (i) "if significant disparities exist between the legal rights of the [claimholders] which render the two claims not substantially similar"; (ii) "if there are good business reasons to do so"; or (iii) "if the claimants have sufficiently different interests in the plan." *In re Wabash Valley Power Ass'n*, 72 F.3d 1305,

26

1321 (7th Cir. 1995) (internal quotations omitted) (alteration added), *abrogated on other grounds by In re Castleton Plaza, LP*, 707 F.3d 821 (7th Cir. 2013); *see also Polite Enters. Corp. Pty Ltd. v. N. Am. Safety Prods., Inc*, No. 13 C 1089, 2014 WL 321668, at *5 (N.D. Ill. Jan. 29, 2014) (citing *Wabash Valley* for these points); *In re STC, Inc.*, No. 14-41014, 2016 WL 3884799, *5 (Bankr. S.D. Ill. Apr. 7, 2016) (observing that classification is proper if any of the circumstances identified by *Wabash Valley* is present).

      **1.      The Infinity claim is unique, making its separate classification proper.**

Infinity is materially different from Class 4 general unsecured creditors, insofar as (a) Infinity holds the largest claim in the chapter 11 case that did not operate through a segregated account; (b) the Debtor received roughly $6.1 million in Top-Down and Sideways Funds allocable to Infinity between July 11, 2025 and July 31, 2025—an amount approximately ten times larger than that of any other owner—meaning that if it did prevail in the Infinity Adversary Proceeding, it likely would have received a recovery far in excess of any other Owner based on tracing; (c) Infinity is the only owner that filed and prosecuted an adversary proceeding against the Debtor on account of purported Owner Trust Claims and obtained an order enjoining use of the Restricted Funds, which will be lifted upon confirmation of the Plan; (d) Infinity is the only owner that has voluntarily agreed to waive a portion of its claim and disclaim rights to distributions from certain Estate assets; and (e) continued litigation with Infinity in the Infinity Adversary Proceeding, including anticipated appeal practice, would have (i) consumed substantial Estate recourses (likely consuming an incremental benefit to be gained from a successful outcome); (ii) borne substantial litigation risk that, if adversely ruled upon from the Debtor's perspective, would effectively eliminate certain avoidance actions and/or other substantive rights under the Bankruptcy Code and

27

applicable law that the Debtor believes would otherwise be meritorious; and (iii) would have delayed distributions to Class 4 creditors for an undetermined period of time.

Infinity's legal rights and different interests in the Plan set it apart from other unsecured creditors. Classification is appropriate on this basis alone. *See Woodbrook Assocs.*, 19 F. 3d at 318-20.

**2.      Separate classification is warranted to effect the Infinity Settlement.**

The Bankruptcy Code expressly permits the implementation of a settlement through a chapter 11 plan. 11 U.S.C. § 1123(b)(3). Separate classification is considered appropriate if its purpose is to effectuate such a settlement. *See Wabash Valley*, 72 F.3d at 1321 (upholding separate classification of settling party where settlement was intertwined with, and dependent on, plan); *In re Save Our Springs (S.O.S. ) Alliance, Inc.*, 388 B.R. 202, 236 (Bankr. W.D. Tex. 2008) (holding that settling creditors' claims were "uniquely situated," and therefore warranted separate classification); *cf. In re Draiman*, 450 B.R. 777, 792 (Bankr. N.D. Ill. 2011) (holding that separate classification was proper because the debtor was "involved in litigation" with, and held counterclaims against, the separately classified creditors).

In light of the unique strengths of the Infinity Claim as described in the preceding section, the Plan Proponents elected to settle the claim. This settlement, in turn, means that Infinity holds "different interests in the plan" than other unsecured creditors. *Wabash Valley*, 72 F.3d at 1321 (noting that settling party's "stake in the . . . reorganization differs significantly enough from that of the other unsecured creditors to warrant the separate classification of its claims").

Further, given the requirement that a plan provide the same treatment to all members of a class, 11 U.S.C. § 1123(a)(4), it would be unnecessarily complicated (and in many cases impossible) to effect a settlement with a creditor *without* classifying it separately from non-settling

creditors. If entering into a settlement is a permissible purpose of a Chapter 11 plan, then a classification necessary to achieve this purpose must also be permissible. Here, if the Plan Proponents did not place Infinity into its own class, they would be unable to provide Infinity the treatment that, with the support of almost all creditors, resolves the Infinity Adversary Proceeding. This alone is sufficient reason for Infinity's separate classification.

    **3.**     **There would be an impaired, accepting class even without Infinity's separate classification.**

CIT claims Infinity is separately classified to ensure the affirmative vote of at least one impaired class. But CIT overlooks the fact that there is an impaired, accepting class even without considering Infinity: Class 3. As the Plan Proponents' ballot report will reflect, Class 3 (Erroneous Payment Claims) has voted in favor of acceptance, independently satisfying the requirement that "at least one class that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(1).

CIT has not objected to the separate classification of Class 3, nor could it. Unlike ordinary unsecured creditors, holders of Erroneous Payment Claims assert that specific funds paid to the estate were paid in error and could assert a claim for restitution resulting in the equivalent of a security interest in funds comprising Erroneous Payment Claims (which funds have been segregated pursuant to Court Order – *See* Dkt. No. 197); hence, the legal characteristics of their claims may materially differ from a general claim for breach of contract. That distinct posture necessitates distinct treatment, as well as a distinct mechanism for adjudicating such claims. Separate classification is appropriate both because Class 3 claimants may hold different legal rights than Class 4 creditors, and because separate classification is necessary to implement the Plan's claims-resolution and reserve mechanism for these contested, trust-type claims. Furthermore, attempting to classify holders of Erroneous Payment Claims into Class 4 with general unsecured

claims would likely have resulted in a contested confirmation necessitating much discovery that would have derailed the confirmation process.

Because there exists another impaired, accepting class independent of Infinity's classification, common sense dictates that the reasoning behind Infinity's classification was not gerrymandering, but rather the unique nature of the Infinity's Claim and the need to implement the Infinity Settlement, both of which are permissible bases for separate classification.

## D.      The Plan Does Not Unfairly Discriminate.

CIT's unfair discrimination argument fails because, as stated, Class 2 reflects settlement treatment supported by distinct consideration and a materially different litigation posture, not ordinary distribution treatment for a passive unsecured creditor. Section 1129(b)(1) prohibits only unfair discrimination, not every difference in treatment among impaired classes. *See* 11 U.S.C. § 1129(b)(1); *In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *aff'd*, 126 F.3d 955 (7th Cir. 1997), *rev'd* on other grounds *sub nom. Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999). The inquiry is fact-specific and asks whether similarly situated classes receive materially different treatment without a legally acceptable and reasonable basis; courts in this Circuit have not adopted a single rigid test. *See 203 N. LaSalle*, 190 B.R. at 585-86; *In re Quay Corp.*, 372 B.R. 378, 385-86 (Bankr. N.D. Ill. 2007); *In re Draiman*, 450 B.R. 777, 818 (Bankr. N.D. Ill. 2011). Infinity was uniquely positioned because it actively litigated ownership issues, pursued conversion, held the largest non-segregated-account owner claim, and gave consideration Class 4 creditors did not.

CIT's reliance on the *Markell* formulation, as quoted in *Quay*, does not alter that conclusion. *See Quay*, 372 B.R. at 386. Even under *Markell*, any presumption of unfair discrimination is rebuttable, and the alleged disparity must be assessed in light of the value and

30

risk allocation created by the Plan as a whole. *See id*. Class 2 does not receive an unexplained premium; it receives bargained-for settlement treatment that resolves Infinity's disputes and leaves the net proceeds of preserved Causes of Action—including claims against CIT, similarly situated creditors, and insiders—for the Liquidating Trust and the creditor body.

Nor does the Plan allocate materially greater risk to Class 4 merely because the Estate settled claims against Infinity while preserving claims against non-settling parties. Section 1123(b)(3)(A) expressly permits a plan to settle or adjust estate claims, and bankruptcy settlements are appropriate where they are fair, equitable, in the best interests of the estate, and within the range of reasonableness. *See* 11 U.S.C. § 1123(b)(3)(A); *Energy Co-op., Inc.*, 886 F.2d at 927; *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994). The Infinity release is part of that settlement bargain, not a plan distribution to Infinity at Class 4's expense. Settling with one litigation counterparty while preserving claims against others is the ordinary operation of a plan settlement authorized by the Bankruptcy Code. *See* 11 U.S.C. § 1123(b)(3)(A); *Energy Co-op.*, 886 F.2d at 927; *Depoister*, 36 F.3d at 586.

The record also supplies more than a reasonable basis for the alleged differential treatment. Talking CIT's contrary position to its logical conclusion, CIT's objection incorrectly converts any settlement with one potential defendant into unfair discrimination against every non-settling potential defendant. Indeed, CIT seems to assert that the *only* "non-discriminatory" outcome here would have been a settlement in which Infinity would not have received a release and would have received a *pro rata* distribution with other creditors; an absurd result that would have required Infinity to simply capitulate to the Estate in its entirety. If CIT's interpretation of the applicable standards is correct, settlements of contested litigation matters in bankruptcy would become impossible.

31

For the foregoing reasons, the Plan is fair and equitable with respect to Class 4. For a dissenting class of unsecured claims, the absolute priority requirement is satisfied if the class is paid in full or if no junior holder receives or retains property under the plan on account of a junior claim or interest. *See* 11 U.S.C. § 1129(b)(2)(B)(ii); *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441-42 (1999). Class 5 Interests are junior to Class 4 General Unsecured Claims, receive no distribution under the Plan, and will be canceled and extinguished as of the Effective Date. Accordingly, the Plan satisfies section 1129(b), and CIT's unfair-discrimination objection should be overruled.

## CONCLUSION

For the foregoing reasons, the Plan Proponents respectfully request that this Court enter an order:

a.   Overruling the CIT Objection in its entirety;

b.   Approving the Infinity settlement embodied in the Plan pursuant to Bankruptcy Rule 9019 and the Plan's settlement provisions;

c.   Finding that the separate classification and treatment of Infinity's claim in Class 2 is appropriate under section 1122 of the Bankruptcy Code;

d.   Confirming the Second Amended Joint Plan of Liquidation; and

e.   Granting such other and further relief as this Court deems just and proper.

Dated: July 6, 2026

**ADELMAN & GETTLEMAN, LTD.**           **TUCKER ELLIS LLP**


By:___/s/ Adam P. Silverman_____          By:___/s/ Thomas R. Fawkes_____
Adam P. Silverman                          Thomas R. Fawkes
Alexander F. Brougham                      Brian J. Jackiw
Nicholas R. Dwayne                         Jason J. Ben
53 W. Jackson Blvd., Suite 1050            233 S. Wacker Dr., Suite 6950
Chicago, Illinois 60604                    Chicago, Illinois 60606

Tel: (312) 435-1050

asilverman@ag-ltd.com
abrougham@ag-ltd.com
ndwayne@ag-ltd.com
*Counsel for Debtor and Debtor in Possession,*
*RAS Data Services, Inc.*

Tel: (312) 624-6300

thomas.fawkes@tuckerellis.com
brian.jackiw@tuckerellis.com
jason.ben@tuckerellis.com
*Counsel to the Official Committee of*
*Unsecured Creditors*

33